**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| EVAN BLUM,<br><br>Plaintiff,<br><br>vs.<br><br>BETTY SALOMON, individually and in her capacity as executrix of THE ESTATE OF MILTON SALOMON, and DAVID SALOMON,<br><br>Defendants. | ) | Case No.: 07-009T<br><br>JURY DEMAND |

## FIRST AMENDED COMPLAINT

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure and in accordance with this Court's order of February 22, 2007, Plaintiff Evan Blum hereby amends his pleading in the above-captioned matter to state the following causes of action against Defendants Betty Salomon, the Estate of Milton Salomon, and David Salomon.

## PARTIES

1. Plaintiff Evan Blum ("Mr. Blum") is a resident of the State of New York, with domicile at 216 East 125th Street in New York City, New York.

2. Upon information and belief, Defendant Betty Salomon ("Mrs. Salomon") is a resident of the State of Rhode Island, with domicile at 6 Baldwin Court in Narragansett, Rhode Island.

3. Upon information and belief, Mrs. Salomon is the executrix of the Defendant Estate of Milton Salomon ("Mr. Salomon"), now deceased.

4. Upon information and belief, Defendant David Salomon ("David") is the son of Mr. and Mrs. Salomon and a resident of the Commonwealth of Massachusetts, with domicile at 58 Pleasant Street, in Cambridge, Massachusetts.

## JURISDICTION

5. The amount in controversy in this civil action exceeds $75,000.00, exclusive of interests and costs.

6. Complete diversity of citizenship exists between Mr. Blum as Plaintiff and Betty Salomon, the Estate of Milton Salomon, and David Salomon as Defendants.

7. Based upon paragraphs nos. 5 and 6 above, jurisdiction exists in the District Court pursuant to 28 U.S.C § 1332(a)(1).

## FACTUAL ALLEGATIONS

8. Mr. Blum owns a house located at 206 Alton Bradford Road, in Hopkinton, Rhode Island, also designated as Lot 34A on Hopkinton Tax Assessor's Plat 6.

9. Mr. and Mrs. Salomon ("the Salomons") own a house located at 222 Alton Bradford Road, in Hopkinton, Rhode Island, designated as Lot 35 on Hopkinton Tax Assessor's Plat 6 ("the Property"), which lot lies directly adjacent to and north of the aforementioned lot owned by Mr. Blum.

10. Mr. Blum and the Salomons have a relationship spanning approximately 34 years.

11. Prior to the events described herein, Mr. Blum and the Salomons were friends.

12. In August of 2005, the Salomons' adult daughter, Deborah Salomon ("Deborah") went swimming off of the dock on Mr. Blum's property at 206 Alton Bradford Road.

13. As Deborah left Mr. Blum's property, she spoke with Mr. Blum.

14. Deborah informed Mr. Blum that Mr. Salomon was in the hospital.

15. Deborah informed Mr. Blum that her parents wanted to sell the Property.

16. Shortly thereafter, Mr. Blum spoke with Deborah at the Salomons' home on the Property.

17. Mr. Blum inquired whether she knew how much the Salomons planned to ask for the

Property.

18. Deborah replied that her parents wanted to be fair about it and that they were having the Property appraised by two different appraisers.

19. Mr. Blum asked who the appraisers were.

20. Deborah replied that the appraisers were recommended by the Salomons' bank.

21. Upon information and belief, the Salomons engaged Susan L. Weeden to appraise the Property, which appraisal valued the Property at $615,000.00 as of August 18, 2005.

22 Upon information and belief, the Salomons engaged Randall Realtors GMAC to appraise the Property, which appraisal valued the Property at $489,900.00 if sold as is, or $625,000.00 if subdivided, as of August 25, 2005.

23. Upon information and belief, on September 20, 2005, the Salomons learned that the Town of Hopkinton assessed the Property at $271,100.00.

24. On or about September 12, 2005, Mrs. Salomon delivered a solicitation of the Property to Mr. Blum at 206 Alton Bradford Road.

25. The solicitation stated the Salomons' asking price as $850,000.00.

26. The solicitation indicated that the asking price was based upon the value of the Property as determined by two appraisals.

27. Mr. Blum expressed interest in the Property.

28. On September 20, 2005, the Salomons' attorney, Attorney Victor Orsinger ("Attorney Orsinger"), sent Mr. Blum a proposed purchase and sale agreement.

29. Attorney Orsinger told Mr. Blum that if any problems arose, adjustments would be made.

30. David told Mr. Blum that the $850,000.00 asking price was just "slightly" above the appraised value of the Property.

31. On October 3, 2005, Mr. Blum signed the purchase and sale agreement attached as **Exhibit A** ("the Agreement"), thereby agreeing to purchase the Property for $825,000.00.

32. The Salomons countersigned the Agreement later the same day.

33. The Agreement contained no contingencies as to financing or inspection.

34. The Agreement contained no integration clause.

35. The Agreement anticipated closing on December 30, 2005.

36. On October 11, 2005, Mr. Blum tendered a deposit in the amount of $82,500.00.

37. Attorney Orsinger continues to hold Mr. Blum's deposit in escrow.

38. Mr. Blum's lender, American Home Mortgage, had the Property appraised by Forsythe Appraisals, LLC, which appraisal valued the Property at $450,000.00 as of December 8, 2005.

39. Following his receipt of the Forsythe appraisal, Mr. Blum telephoned David and informed him of the discrepancy in value.

40. David replied the Agreement would be refigured.

41. Mr. Blum also telephoned Attorney Orsinger and informed him of the discrepancy in value.

42. Attorney Orsinger replied that he understood the problem, stated that the Salomons were reasonable people, and indicated that the Salomons would make an adjustment.

43. On December 27, 2005, Mr. Blum visited the Salomons at their condominium in Narragansett.

44. During the aforementioned visit, Mr. Blum told Mr. Salomon that a problem had arisen with the Agreement.

45. Mr. Salomon replied, "no, you have a problem."

46. Mr. Blum thereafter declined to go forward with the December 30, 2005 closing.

47. On January 4, 2006, Mr. Blum and the Salomons met at the offices of Attorney Orsinger.

48. During the aforementioned meeting, Mr. Blum proposed amending the Agreement to reflect a purchase price of $625,000.00.

49. The Salomons declined Mr. Blum's proposal and insisted on a purchase price of $825,000.00.

50. The Salomons subsequently listed the Property with a real estate broker in March of 2006 with an asking price of $850,000.00.

51. Upon information and belief, as of the date of the filing of the First Amended Complaint, the Salomons have received no offers for the Property.

**COUNT I**

*Fraud in the Inducement*

52. Mr. Blum hereby incorporates by reference all of the factual allegations set forth in the paragraphs above as if fully set forth in this paragraph.

53. David told Mr. Blum that the $850,000.00 asking price was just "slightly" above the appraised value of the Property.

54. The solicitation which Mrs. Salomon delivered to Mr. Blum stated that the $850,000.00 asking price was based upon the value of the Property as determined by two appraisals.

55. The asking price of $850,000.00 was, in fact, $225,000.00 above the highest appraisal the Salomons had received.

56. The Salomons and David knew or should have known that their representations to Mr. Blum as to the value of the Property were false.

57. The Salomons and David knew or should have known that had they corrected their misrepresentation as to the value of the Property, Mr. Blum would not have agreed to purchase the Property for the sum of $825,000.00.

58. Due to their long relationship, the Salomons and David knew or should have known that Mr. Blum would rely on their representations as to the value of the Property.

59. The Salomons and David intended for Mr. Blum to rely on their representations as to the value of the Property.

60. Mr. Blum, in fact, did rely on the representations of the Salomons and David as to the value of the Property.

61. As friends, Mr. Blum trusted the representations of the Salomons and David as to the value of the Property.

62. As friends, Mr. Blum trusted the assurances of the Salomons and David that they would amend the agreement if any problems arose.

63. Mr. Blum has incurred substantial losses as a result of his reliance on the representations of the Salomons and David.

**COUNT II**
*Negligent Misrepresentation*

64. Mr. Blum hereby incorporates by reference all of the factual allegations set forth in the paragraphs above as if fully set forth in this paragraph.

65. The Salomons and David held a pecuniary interest in the sale of the Property.

66. David told Mr. Blum that the $850,000.00 asking price for the Property was just "slightly" above the appraised value of the Property.

67. The solicitation which Mrs. Salomon delivered to Mr. Blum stated that the $850,000.00 asking price was based upon the value of the Property as determined by two appraisals

68. The asking price of $850,000.00 was, in fact, $225,000.00 above the highest appraisal the Salomons had received.

69. The Salomons and David knew or should have known that their representations to Mr.

Blum as to the value of the Property were false.

70. The Salomons and David offered the representations described above for Mr. Blum's guidance in deciding whether to purchase the Property.

71. The Salomons and David knew or should have known that Mr. Blum believed that the purchase price was substantially supported by two appraisals, but failed to correct his understanding.

72. As friends, Mr. Blum relied on the representations of the Salomons and David as to the value of the Property.

73. As friends, Mr. Blum trusted the assurances of the Salomons and David that they would amend the agreement if any problems arose.

74. Mr. Blum has incurred substantial losses as a result of his reliance on the representations of the Salomons and David.

**COUNT III**
*Good Faith and Fair Dealing*

75. Mr. Blum hereby incorporates by reference all of the factual allegations set forth in the paragraphs above as if fully set forth in this paragraph.

76. The Agreement included a covenant of good faith and fair dealing.

77. The Salomons and David failed to honestly represent the value of the Property in discussions with Mr. Blum.

78. The Salomons and David failed to honestly represent their intention not to entertain the possibility of amending the Agreement if problems arose.

79. The Salomons and David intentionally dissuaded Mr. Blum from negotiating the Agreement in the manner of an arms-length transaction.

## PRAYER FOR RELIEF

In light of the foregoing claims, Mr. Blum requests the following relief:

a. An award of compensatory and punitive damages in an amount to be determined at trial, or

b. Rescission of the Agreement and the return of Mr. Blum's deposit, or

c. Reformation of the Agreement to reflect the fair market value of the Property, and

d. All further relief that this Court deems appropriate under the circumstances.

Dated: March 22, 2007

The Plaintiff,
Evan Blum
By his Attorneys,
Ratcliffe Burke Harten & Elias LLP

/s/ J. Richard Ratcliffe
J. Richard Ratcliffe, #2603
1600 Financial Plaza
Providence, RI 02903
Tel: 401-331-3400
Fax: 401-331-3440

A

SALES AGREEMENT

AGREEMENT made this 3rd day of October, 2005 by and between MILTON SALOMON and BETTY M. SALOMON, husband and wife, both of Bradford, Rhode Island, hereinafter called the "Sellers" and EVAN BLUM, of New York, New York, hereinafter called the "Buyer".

1. **DESCRIPTION OF PREMISES:**

The Sellers hereby agree to sell and the Buyer to purchase certain real property presently identified as Lot 34A on Assessor's Plat 6 and located at 222 Alton-Bradford Road in the Town of Hopkinton, County of Washington, and State of Rhode Island, under the terms and subject to the conditions hereinafter set forth, such real property being described in greater detail in Exhibit A attached hereto and made a part hereof, and subject to the restrictions set forth in said Exhibit A, if any.

2. **SALE PRICE AND DEPOSIT:**

Said real property is to be conveyed and granted by a good and sufficient Warranty Deed of the Sellers conveying and granting to the Buyer or his nominee a good and clear and marketable title to the same, free from all encumbrances, except any condition, restriction or reservation set forth in Exhibit A, and for such Deed and conveyance, the Buyer is to pay the Sellers the sum of EIGHT HUNDRED TWENTY-FIVE THOUSAND ($825,000.00) DOLLARS, of which said sum, EIGHTY-TWO THOUSAND FIVE HUNDRED ($82,500.00) DOLLARS is tendered herewith, and the balance thereof shall be payable at Closing upon delivery of said Deed, in cash, Cashier's Check or Certified Check.

3. **TAX APPORTIONMENT, ETC:**

Real property taxes, including Fire District Taxes, assessed as of the last assessment date shall be apportioned as of the date of delivery of the Deed and payment of the consideration. Rents, Common Charges, Sewer and Water Use Charges and/or assessments, shall be apportioned as of the date of delivery of the Deed and payment of the consideration.

4. **POSSESSION:**

Full possession of said property, free from all tenants, is to be delivered by the Sellers to the Buyer on the date of Closing, the said real estate to be then in the same condition in which it is now, ordinary wear and tear excepted.

5. **PERSONAL PROPERTY:**

The Sellers hereby agree to transfer and convey unto the Buyer the personal property permanently affixed to the premises.

6. **CLOSING:**

The Deed is to be delivered, and the consideration paid, at Orsinger & Nardone, 53 High Street, Westerly, Rhode Island 02891, on or before December 30, 2005 at 10:00 a.m., or at such date, time and location as may be mutually agreed upon by the Parties.

7. **TITLE:**

The Sellers shall furnish marketable title and shall convey the property free from all encumbrances, except those encumbrances, restrictions, conditions, which appear of record and which do not render said title unmarketable, and except such conditions and restrictions as set forth in Exhibit A attached hereto and incorporated herein. In the event that Buyer's title examination reveals that said title to the premises is not good and marketable, Buyer shall, prior to the time set for the Closing, notify Sellers, in writing, of his objections to the title. In the event of such title objections, the Sellers shall have a reasonable time within which to cure them. In the event Sellers are unable to furnish marketable title within a reasonable period of time, the Buyer may either rescind this Agreement and receive back the deposit without interest, or may accept such title as the Sellers are able to convey without reduction of the selling price, and the acceptance of a Deed shall be deemed to be a full performance and discharge hereof. The term "good and marketable title" shall be determined with reference to the standards of title of the Rhode Island Bar Association.

8. **BUYER'S OR SELLERS' DEFAULT:**

If the Buyer shall fail to make payment as herein agreed, the Sellers shall have the right to retain the deposit, such right to be without prejudice to the right of the Sellers to require specific performance or the payment of other or further damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default. On default of the Sellers, the Buyer may reclaim any monies paid hereunder as a deposit, such right to be without prejudice to the right of the Buyer to require specific performance or the payment of other damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default.

9. CONDITION OF PREMISES:

The Buyer agrees that if any, said Buyer has examined the premises and is fully satisfied with the physical condition thereof and that neither the Sellers, nor any representative of the Sellers, have made any representation upon which the Buyer relies, with respect to the condition of the property covered by this Agreement, except as expressly set forth in this Agreement.

10. REAL ESTATE BROKER RELATIONSHIPS AND COMMISSION:

Both Sellers and Buyer acknowledge that no real estate broker is involved in this transaction.

11. INSURANCE:

Sellers shall keep the premises insured against fire, and other contingencies with a standard fire insurance policy as presently covered, and in the event of damage by fire or other casualties, the Buyer shall have the option to elect between recision of this Agreement or to accept the insurance proceeds and to take the premises in their damaged condition.

12. WETLANDS DISCLOSURE:

Pursuant to Chapter 175 of the Public Laws of Rhode Island 1983 (Section 2-1-26), the Seller hereby discloses that all or a part of the premises may have previously been determined by the Rhode Island Department of Environmental Management to be coastal wetland, bog, fresh water wetland, pond, marsh, river bank, or swamp, as these terms are defined in Chapter 1 of Title 2 of the Rhode Island General Laws.

13. COMPLIANCE:

Buyers of real estate in the State of Rhode Island are legally obligated to comply with all local real estate ordinances; including but not limited to ordinances on the number of unrelated persons who may legally reside in a dwelling, as well as ordinances on the number of dwelling units permitted under the local zoning ordinances.

Radon has been determined to exist in the State of Rhode Island. Testing for the presence of Radon in residential real estate prior to purchase is advisable.

14. SMOKE DETECTORS:

Rhode Island Law requires that all existing one, two, and three family dwellings, and all existing condominium units in buildings with less than eight units, shall, at the responsibility

of the Sellers, before title to the property is conveyed as the result of a sale, be equipped with an approved smoke detection system. A Smoke Detector Certificate must be obtained by the Seller within sixty (60) days prior to the Closing date.

15. **LEAD DISCLOSURE:**

Every Buyer of residential real estate built prior to 1978 is hereby notified that such properties may have lead exposures that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduce I.Q., behavioral problems, and impair memory. The Sellers of such property is required to provide the Buyer with a copy of Lead Inspection Reports in the Seller's possession and notify the Buyer of any known lead poisoning problem. Environmental lead inspection is recommended prior to purchase.

16. **BINDING EFFECT:**

The within Agreement is binding upon the heirs, executors, administrators, successors and assigns of the Parties hereto.

17. **NOTICES:**

Any Notices in writing required to be given to the Seller shall be hand-delivered or sent by regular mail, postage prepaid, to the following address:

Milton Salomon
Betty M. Salomon
222 Alton Bradford Road
Bradford, RI 02808

With a copy to:

Victor J. Orsinger, Esq.
53 High Street - PO Box 558
Westerly, RI 02891

Any Notices in writing required to be given to the Buyer shall be hand-delivered or sent by regular mail, postage prepaid, to the following address:

Evan Blum
216 East 125th Street
New York, NY 10035

IN WITNESS WHEREOF, the Parties hereto have hereunto and to another instrument of like tenor, set their hands and seals this 3rd day of October, 2005.

BUYER:

Evan Blum

SELLERS:

Milton Salomon

Betty M. Salomon

EXHIBIT A

A certain tract or parcel of land with all buildings and improvements thereon situated near the Village of Burdickville, so-called, in the Town of Hopkinton, County of Washington and State of Rhode Island, and bounded and described as follows, to wit:

Beginning at the southeast corner of these premises at a point where a stone wall meets the Pawcatuck River at the northeast corner of land now or formerly of Rea Gentl; thence proceeding in a straight line along said stone wall in a general northwesterly direction along said Gentl land and continuing in the same straight line to the Bradford Alton Road said point being the southwesterly corner of these premises and the northwesterly corner of said Gentl land; thence turning and proceeding in a northerly direction along said Bradford-Alton Road a distance of 700 feet, more or less, to a bound set in the ground at the northwest corner of these premises said point being in a line 700 feet north of said stone wall and parallel to it where it meets the Bradford-Alton Road; thence turning and proceeding in a line 700 feet distant northerly from and parallel with said first mentioned line in a general southeasterly direction to a second stream and along this stream to the Pawcatuck River bounded northerly by land now or formerly of Anthony Armao; thence turning and proceeding along said River to the starting point at the stone wall; the land is bounded on the north by land now or formerly of Anthony Armao, on the east by the Pawcatuck River, on the south by land now or formerly of Rea Gentl and on the west by the Bradford-Alton Road; said parcel of land containing by estimate twenty (20) acres, more or less, together with all riparian rights appurtenant thereto.

Subject to easements and restrictions that appear of record.